UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

MIKE FLYNN, et al.,                    )
                                       )
                    Plaintiffs,        )
                                       )
v.                                     )          Case No.  1:12CV68 SNLJ
                                       )
CTB, INC.,                             )
                                       )
                    Defendant.         )

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's motion for summary judgment and

plaintiffs' motion for class certification.  The motions have been fully briefed and are ripe

for disposition.  For the following reasons, the motion for summary judgment will be

granted in part and denied in part.  The motion for class certification will be denied.

## I.      Background

At various times in 2007 and 2008, plaintiffs Mike Flynn, Steve Watkins, and

Donnie Underwood d/b/a Underwood Farms each purchased a Brock Harvest-Time Bin

Unload System with power sweep (HT sweep) manufactured by defendant CTB, Inc.

The system was marketed to unload free-flowing grains.  Plaintiffs filed this action on

behalf of themselves and a putative class alleging that the HT sweep did not function

properly.  Plaintiffs allege that the HT sweep cannot maintain sufficient contact with the

grain nor move it with sufficient force to sweep the grain into the unloading system

beneath the grain bin floor.  Workers must push the sweep into the grain, exposing the

workers to hazards, causing delays, and decreasing the value of the grain bin.

Plaintiffs claim that defendant has known of the shortcomings of the HT sweep since at least 2006.  They allege that defendant has made numerous modifications to the HT sweep to improve its effectiveness, but the changes have not remedied the inherent design limitations.  Plaintiffs further allege that the HT sweep cannot move common grains such as corn, rice, wheat, and soybeans.  Plaintiffs seek class-wide relief for all purchasers of the HT sweeps in refunds or replacement sweeps.  Plaintiffs have pled claims for breach of express warranty, breach of implied warranty, and fraud.

Plaintiffs seek class certification of a breach of implied warranty class with plaintiff Flynn as class representative and a fraud class with plaintiffs Watkins and Underwood as class representatives.  Defendant opposes class certification and seeks summary judgment on the claims of Flynn, Watkins, and Underwood.  Plaintiff opposes summary judgment on the breach of implied warranty claim of plaintiff Flynn and the fraud claim of plaintiffs Watkins and Underwood.  Plaintiffs do not contest the motion on all other claims, including the breach of express warranty claims of all plaintiffs.

## II.    Motion for Summary Judgment

### A.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.  317, 322 (1986).  The burden is on the moving party.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).  After the moving party discharges this burden,

the nonmoving party must do more than show there is doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must set forth specific facts showing there is sufficient evidence in his favor to allow a jury to return a verdict for him. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324.

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.,* 210 F.3d 845, 847 (8th Cir. 2000). Finally, the court must resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

### B. Facts

The Court has reviewed the parties' statements of uncontroverted material facts, the responses, and the supporting documentation, and, where appropriate, will accept facts as supported by appropriate admissible evidence. These undisputed facts are before the Court on this motion. Additional facts are set forth in the discussion.

<u>Defendant's Facts</u>

CTB sells the Brock Harvest-Time Bin Unload System with the power sweep to dealers, who then sell the sweeps to end users. Plaintiffs Mike Flynn, Steve Watkins, and

Donnie Underwood d/b/a Underwood Farms are Missouri residents who purchased HT sweeps from Bruce Martin Construction, Inc. (BMCI). For the warranty claims, plaintiffs allege that the HT sweeps they purchased failed to conform to CTB's express warranty that the sweeps would be free of defects in material and workmanship for one year following the date of initial installation by or for the original purchaser. Further, plaintiffs allege that the HT sweeps failed to conform to the implied warranty of merchantability in that they "will not sweep around the grain bin under [their] own power when unloading common grains such as rice, wheat, soybeans and in some cases corn, rendering [them] ill-suited for [their] intended purpose. [They require] a person or persons to be inside the bin to physically push the auger, creating safety risks, consuming labor, and decreasing the value of the bin."

Plaintiff Underwood purchased two HT sweeps in spring 2007, and the sweeps were installed in May 2007. Underwood first used the HT sweeps in fall 2007. According to Underwood, when he first used the HT sweeps, the sweep arms would not advance into the grain, and "two or three" people had to enter the grain bin to push the sweep arms manually. Underwood claimed he experienced those problems with both sweeps. Plaintiff Watkins also purchased his HT sweep in 2007, and it was installed the same year. Watkins testified that he used the HT sweep to unload rice between September 2007 and January 2008 and, during that process, the sweep arm failed to advance into the grain. Plaintiffs filed this action on April 25, 2012.

Plaintiffs acquired their HT sweeps from BMCI. A Brock Bin Unload System Assembly and Operations Manual (Manual) accompanied each HT sweep. The following language appears in the Manual:

> Brock Manufacturing ("BROCK") warrants each new BROCK® Harvest-Time Bin Unload System manufactured by it to be free from defects in material or workmanship for one (1) year from and after the date of installation by or for the original purchaser. If such defect is found by the Manufacturer to exist within the one-year period, the Manufacturer will, at its option, (a) repair or replace such product free of charge, F.O.B. the factory of manufacture, or (b) refund to the original purchaser the original purchase price, in lieu of such repair or replacement.
>
> * * *
>
> THIS WARRANTY CONSTITUTES THE MANUFACTURER'S ENTIRE AND SOLE WARRANTY AND THE MANUFACTURER EXPRESSLY DISCLAIMS ANY AND ALL OTHER WARRANTIES, INCLUDING, BUT NOT LIMITED TO, EXPRESS AND IMPLIED WARRANTIES AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSES SOLD AND DESCRIPTION OR QUALITY OF THE PRODUCT FURNISHED HEREUNDER.

For the fraud claim, plaintiffs allege that defendant CTB failed to disclose certain information regarding alleged performance problems with the HT sweeps to its dealers and that, had such disclosures been made, the dealers would have conveyed that information to their purchasers and the purchasers would have not purchased the HT sweeps. Bruce Martin of BMCI testified that he first learned of performance problems with the HT sweeps in 2006. Specifically, Martin testified that he received information in 2006 that some HT sweeps, in certain circumstances, "wouldn't advance any in the grain and move the grain to the center of the bin." He further testified that, notwithstanding that knowledge, BMCI continued to sell the HT sweeps to customers "throughout 2006, 2007, and 2008[.]" BMCI made no disclosures to plaintiffs regarding

5

the alleged performance problems. Plaintiffs interacted solely with BMCI in their purchases of the HT sweeps, not with defendant CTB.

Plaintiffs' Facts

*The Problems with the HT Sweep*[1]

Before bringing the HT sweep to market in 2002, CTB conducted limited pre-launch testing in an AGI facility in Canada using wheat and corn, but not rice. The HT sweep is positioned on the backside of center hopper – not in the center. This requires the sweep to push the grain further around the bin floor to deposit it in the hopper. In August of 2004, CTB personnel discussed as an R&D issue the "possibility of developing a kit that would allow a new underfloor tube to be staggered off of center by 6 [inch] and then have a chain and sprocket system to move the sweep gearbox further over the center hopper (centered in the bin). This would allow the rice to fall directly into the center hopper without being pushed (rice does not push and compacts easily)."

On January 29, 2007, a farmer named Robert Schoger faxed CTB about problems with his HTS, including that it had a weak backboard that would drag on the floor. Before launching the HT sweep, CTB and co-manufacturer, AgGrowth International (AGI), had received dealer feedback in 2001 and 2002 that the drive wheel could get snagged on tech screws, reducing its durability. The drive wheel design for the HT sweep was changed five times through October of 2006, and eight times by November

---

[1] The Court sets forth plaintiffs' facts with the headings and organization used by plaintiffs in their statement of facts.

30, 2007.  Changes included attempts to move its location to avoid the tech screws in the bin, adding weights for traction, and changing the gearbox.

In March 2009, CTB and AGI first tested the durability of the drive wheel material.  No specifications for the drive wheel had existed before then.  When the wheel was tested, it was found that the wheel lasted only 45 minutes on the test stand – about one-fourth or one-sixth the duration of competitors' wheels.

The HT sweep has a coupler that connects its sweep arm gearbox to the underfloor gearbox.  By at least June 2006, CTB had received reports of the coupler failing, causing gearbox damage.  Attempts to improve the coupler began as early as 2003.  CTB had not tested the coupler to failure until 2010.  When it was tested, the coupler failed after four hours of continuous use in the test bin.

*Bruce Martin Construction - The Manual and Warranty*

The end purchaser's warranty for the HT sweep is contained within the Assembly and Operations Manual.  CTB's warrants the HT sweep for all free-flowing grains.  Neither the HT sweep brochures nor the warranty state any specific grains for which the sweep was not recommended.  The Manual warned end users not to enter the bin when the sweep was operating.

*Representations to BMCI*

The HT sweep product brochure described the sweep as "a rugged sweep with a reliable reputation," and that its design "eliminates the need to enter the bin for sweep operation."  The brochure states no grain for which the HT sweep is not recommended.  CTB personnel, including Area Manager Deb Good, District Manager Pat Morressey, and

7

Product Manager Tom Duffy, told Martin that the HT sweep would work in grains such as rice, soybeans, milo, and wheat. Martin told Duffy that the HT sweep must work in rice, as that was one of the larger crops in the southeast Missouri area where BMCI operated.

Martin told his customers "Brock was making a power sweep that could be installed in a bin that would handle free flowing grain and you would not have to enter the bin to unload it." After the HT sweeps did not function properly, Martin felt obligated to replace the HT sweep because his farmers "had people in the bin shoveling grain, and that is not what they were told."

In September of 2004, AGI developed a "rice flighting" and "connector stub" to help with rice. On June 9, 2006, Duffy wrote to a dealer named Bud Wood regarding a "rice kit" that CTB and Westfield had developed for customers using the HT sweep in rice. The kit "consists of flighting installed around the universal joint, which helps push the product 8-10 [inches] closer to the center hopper."

Martin told no one that the HT sweep would not work in rice; he thought it looked "marketable." In 2008, Duffy wrote to Martin that using the HT sweep in rice could void the warranty. In July 2008, Good wrote to Martin via email and stated that the HT sweep was not designed for rice. Around the same time, Duffy also told Martin that the HT sweep was not designed for rice. Martin had not been told by Good or Duffy before 2008 that the HT sweep was not designed for rice. Martin had submitted quotes to CTB that noted the bins and HT sweep to be sold to his customers in Southeast Missouri would be used for rice. BMCI stopped selling the HT sweep after Duffy's letter.

*BMCI's Problems with the HT Sweep*

Martin noticed problems with the HT sweep wheels in 2006. He noticed that the wheels would fail to make it around the bin. BMCI worked with CTB personnel as they tried several unsuccessful changes, including moving the wheels off the tech screws, replacing the gearbox, and adding weights. Martin made demands on CTB for repairs throughout 2006-2008. Martin even made some of his own modifications to in an attempt to improve the HT sweep performance, with CTB's knowledge.

CTB sent Duffy and Good to assist, and he contacted them frequently about ideas and possible fixes. Martin testified, "a lot of the issues really came to the forefront as far as problems with the [HT sweep]" in 2008. This timing was likely because bins sold with the HT sweep in 2007 would most likely be unloaded of their grains in 2008. Paul Fout, BMCI vice president, testified that "when you sell 30 or 40 in a year and you put them in and don't use them until the next year and by that time you've got 30 or 40 more sold, we didn't know we had a problem until they were all out there."

BMCI continued to sell the HT sweep because Martin believed "Brock Manufacturing was a reputable company and an honest company and so were the people that worked for it, and we believed that they would take care of the problem." Fout echoed that CTB had promised to fix the HT sweep. BMCI sold bins with the HT sweep to Mike Flynn in May 2008. Martin purchased an HT sweep for his own farm in 2008.

According to Martin, no solutions for the HT sweep came, and the CTB employees, "just sort of stopped helping." Martin did not sell the last four or five he had in stock. After being terminated by CTB as a dealer, BMCI supplied GSI sweeps to some

of his farmers with the HT sweep, including Danny Davis.  Martin found that the GSI

sweeps would unload compacted rough rice and would not require anyone to get into the

bin to push it.  The HT sweep purchasers still had to enter the bin to push the sweep arm,

even to unload corn.

*Plaintiffs' Experiences*

Watkins bought his HT sweep from BMCI in February 2007, with delivery in

March.  Watkins specifically told Martin he would store rice.  Watkins relied on Martin

to make the choice of bin sweep.  When Watkins used his HT sweep to unload wheat in

2007, he had to enter the bin but thought that was not uncommon.  When he tried to

unload rice in January 2008, the HT sweep did not advance.  Watkins notified Martin,

who related the news to Good.  Watkins met with Duffy in May 2008 regarding the non-

performance of his HT sweep and its weak backboard and failing drive wheels.

Underwood bought his HT sweep in April 2007, and it shipped the same month.

Underwood relied on Martin to make the choice of bin sweep.  Underwood's HT sweep

failed to advance in corn, and his farm workers had to enter the bin.

Flynn accepted a BMCI offer to build him a Brock bin equipped with an HT

sweep in March 2008.  The bin and sweep were to be delivered in June 2008.  Flynn's

HT sweep failed to advance in soybeans and corn, requiring entry into the bin to push the

sweep, even with attempted fixes.

On or about November 21, 2008, Good told BMCI client Paul Crouthers that, "I

assure you that we know what needs to be done to solve these situations and are testing

new wheels that will perform in any commodity, including rice."  Good wrote to CTB's

Doug Niemeyer on May 20, 2008 stating, "We do [] have a problem with Bruce Martin Construction" and "IN THEIR defense we have created REAL Tangible problems for Bruce Martin." On Dec. 11, 2008, Good wrote to CTB's Jim Barnes that BMCI's "claims are certainly questionable [] but . . . need to credit and get the termination . . . all of our speculation on the worthiness of his crew, etc is irrelevant now. Indeed, the frustration and true sweep non performance in corn, beans or wheat is valid. Please credit . . . we need to go forward . . . [.]"

### C.    Discussion

In their second amended complaint, plaintiffs allege claims for breach of express warranty, breach of implied warranty, and fraud against defendant. Defendant seeks summary judgment on all claims. In their response, plaintiffs state they are no longer pursuing express warranty claims for any plaintiffs, implied warranty claims for Watkins and Underwood, or a fraud claim for Flynn. Because plaintiffs have not dismissed those claims and did not respond to the motion for summary judgment on those claims, defendant is entitled to summary judgment on plaintiffs' claims for breach of express warranty, the breach of implied warranty claims made by plaintiffs Watkins and Underwood, and the fraud claim made by plaintiff Flynn. The remaining claims are plaintiff Flynn's claim for breach of implied warranty and plaintiffs Underwood and Watkin's claims for fraud. The Court will address the motion for summary judgment on the remaining claims.

1.      **Breach of Implied Warranty Claim**

Missouri UCC law[2] creates an implied warranty of merchantability warranting that goods must be fit for the ordinary purposes for which such goods are used.  *Section 400.2-314 RSMo.*  This implied warranty may be disclaimed in writing by language that is conspicuous and mentions the word merchantability.  *Section 400.2-316(2) RSMo.*

Defendant argues that an effective disclaimer in the written warranty documents bars plaintiff Flynn's breach of implied warranty claim.  According to defendant, Flynn was given the Manual for the HT sweep by BMCI, which contained CTB's express warranty and a disclaimer of any implied warranties as to merchantability and fitness for particular purposes.  The disclaimer was in all capital letters and in larger and contrasting type.  As this meets the definition of conspicuous under Missouri law as it pertains to disclaimers, defendant asserts the disclaimer is effective and it is entitled to summary judgment on the implied warranty claim.

The disclaimer issue, however, is not simply a matter of whether they typeface of the disclaimer language meets the statutory requirement of conspicuous.  That is not disputed.  Instead, defendant and plaintiff offer differing testimony whether BMCI customers, including Flynn, received the Manual.  Martin testified that the Manual was provided to all HT sweep customers but did not testify when the Manual would be provided to customers.  Fout similarly testified that the Manual, which contained the express warranty and disclaimers, was delivered to all customers.  Plaintiff points out that

---

[2] The parties disagree as to whether Missouri or Indiana law applies to the breach of implied warranty claim.  As discussed later in this memorandum, Missouri law applies to plaintiff Flynn's breach of implied warranty claim.

although Martin testified he would provide the Manual to customers, he never testified when he would provide the Manual. Further, Martin testified he would not go through the Manual or the warranty with the end purchaser. Fout testified that the Manual would be delivered to the customers when the HT sweep was delivered. Other HT sweep dealers also testified that the Manual is provided to the farmer after delivery and installation of the grain bin and/or sweep.

As to specific experiences of BMCI customers, plaintiff offered testimony that the Manual was not provided to all customers as testified to by Martin and Fout. Watkins testified he was not provided the HT sweep Manual. Underwood testified that no one at BMCI discussed the warranty with him, nor does he recall receiving the Manual. Flynn did not recall any discussions with BMCI regarding the warranty on the HTS, does not remember receiving a copy of the Manual, and denied seeing the express warranty. Other customers of BMCI have testified that they did not receive the Manual containing the warranty (if ever) before purchase.

Defendant argues Flynn could not controvert the testimony of Martin and Fout that the Manual was given to all customers. Defendant contends that Flynn's testimony that he did not remember seeing a copy of the Manual cannot create a factual dispute on this issue. Based on all the relevant testimony, this Court finds there is a factual dispute whether Flynn was given a copy of the Manual. Neither Martin nor Fout testified based upon personal knowledge that a copy of the Manual was given to Flynn. Instead, they testified to a general practice employed by BMCI to provide the Manual at the time of installation of the grain bin and sweep. However, plaintiff submitted testimony from

BMCI customers that they did not receive the Manual, which contradicts the general practice testimony.

Defendant also claims that by pursuing an express warranty claim, plaintiff Flynn has effectively conceded that he received the Manual and read the disclaimers precluding an implied warranty claim. This Court has previously found this argument to be without merit when raised by defendant in its motion to dismiss. *Flynn v. CTB, Inc.*, 1:12CV68 SNLJ, 2013 WL 28244, at *5 (E.D. Mo. Jan. 2, 2013). Moreover, plaintiff Flynn is no longer pursuing a breach of express warranty claim.

Even if there was no dispute whether Flynn received the Manual that included the disclaimer of implied warranties, there is an issue whether the disclaimer, provided post-purchase and post-installation of the grain bin and HT sweep, is effective. Defendant claims that the modern law on warranties routinely enforces warranty disclaimers included in product manuals delivered with the product. In support of its position, defendant relies on a number of cases dealing with prepackaged products, including purchases at retail stores, that include disclaimers within the packaging. The cases cited by defendant include *Jarrett v. Panasonic Corp of N.Am*, 8 F.Supp.3d 1074, 1081 (E.D. Ark. 2013), *Mitchell v. Taser Intern, Inc.*, 2014 WL 3611632 (E.D. Mich. Jul. 23, 2014), *Spera v. Samsung Electronics Am., Inc.*, 2014 WL 1334256 (D. N.J. Apr. 2, 2014), and *Rinaldi v. Iomega Corp.*, 1999 WL 1442014 (Del. Supp. Sep. 3, 1999).

In *Jarrett*, the Arkansas District Court held that a warranty disclaimer in an owner's manual that came with a Sanyo television purchased at Walmart was conspicuous because it was prominently featured in the middle of the page in capital

letters. *Jarrett*, 8 F.Supp.3d at 1081. The court granted judgment on the pleadings on the plaintiff's breach of implied warranty against Sanyo. In *Mitchell*, the Michigan District Court rejected the plaintiff's argument that an implied warranty disclaimer located at the end of a twenty-five page operating manual provided with a Taser was not conspicuous. *Mitchell*, 2014 WL 3611632, at *5. Because the disclaimer was stated in capitals and bold print, the court held it was conspicuous and was effective to disclaim any implied warranty. *Id.* In *Spera*, the New Jersey District Court held that implied warranty disclaimer language at the end of a user manual accompanying a washing machine was enforceable because the disclaimer, in all capital letters, was clear and conspicuous. *Spera*, 2014 WL 1334256, at *8. This Court does not find *Jarrett*, *Mitchell*, or *Spera* relevant to the circumstances of this case. Those cases do not involve the type of transaction made in this case and do not address the issue raised here.

In *Rinaldi*, the Delaware District Court held that warranty disclaimer language contained within the packaging of a Zip drive was effective and dismissed the plaintiffs' claim for breach of the implied warranty of merchantability. *Rinaldi*, 1999 WL 1442014, at *5. There was not an issue on placement of the language within the warranty or the typeface of the disclaimer. *Id.* at *3. Instead, plaintiffs argued "the disclaimer, located in the packaging of the product, could not realistically be called to the attention of the consumer until after the sale had been consummated, thus rendering the disclaimer not 'conspicuous.'" *Id.* The defendant argued that the "modern commercial realties of how contracts are formed with consumers of prepackaged products necessitates that the terms

15

of [its] warranty disclaimer be given effect. *Id.* at *2. In its decision, the district court declared:

> The commercial practicalities of modern retail purchasing make it eminently reasonable for a seller of a product such as a Zip drive to place a disclaimer of the implied warranty of merchantability within the plastic packaging. The buyer can read the disclaimer after payment for the Zip drive and then later have the opportunity to reject the contract terms (i.e., the disclaimer) if the buyer so chooses. This Court concludes that Defendant's disclaimer of the implied warranty of merchantability was effective despite its physical placement inside the packaging of the Zip drive and has satisfied the conspicuousness requirement of *6 Del. C. § 2–316(2).*

This Court does not find the *Rinaldi* decision relevant to the facts of this case. *Rinaldi* does not involve the type of transaction made in this case. The rationale for the *Rinaldi* decision does not apply here. The instant case does not involve a purchase by a consumer of a prepackaged product.

Instead, this Court finds persuasive the rationale of other courts holding warranty disclaimer language effective only where the plaintiff had notice, actual or constructive, of the disclaimer before or at the time of the purchase of goods that are more comparable to the purchase of the farm equipment at issue. In *Swan Lake Holdings, LLC v. Yamaha Golf Cart Co.,* 2010 WL 3894576, at *6 (N.D. Ind. Sept. 27, 2010), the Indiana District Court denied summary judgment for defendant on plaintiff's breach of implied warranty claim because there was no evidence of how and when the plaintiff received the warranty that included the disclaimer language regarding the purchase of golf carts. The court was troubled "by the lack of evidence as to whether [plaintiff] had notice of this attempted disclaimer before or at the time it purchased the golf carts." *Id.* at *5. The court stated, "[a] conspicuousness requirement is meaningless if the buyer can't read the

warranty at the time of the sale, or reads the warranty only after the fact." *Id.* The court cited to other cases finding implied warranty disclaimers ineffective when they appear in a document received by the buyer after the sale is finalized. *Id.*

In *Kehrer Broth. Const., Inc. v. Custom Body Co., Inc.*, 2008 WL 182503, at *9 (S.D. Ill. Jan. 18, 2008), the Illinois District Court denied summary judgment for defendant on plaintiff's breach of implied warranty claim because there was no evidence that the plaintiff was informed of the disclaimer prior to the sale of the commercial hydraulic crane at issue. In its decision, the court stated:

> The requirement that a writing be conspicuous so that a reasonable person would notice it gives rise to the notion that the reasonable person actually *see* the document containing the disclaimer language.

*Id.* at *8.

In *Bowdoin v. Showell Growers, Inc.*, 817 F.2d 1543 (11th Cir. 1987), the Eleventh Circuit held that warranty disclaimer language did not effectively disclaim the implied warranty of fitness and merchantability when it was delivered to the purchaser in an instruction manual that accompanied a high pressure spray rig. *Bowdoin*, 817 F.2d at 1544. The court held that the post-sale disclaimer was not effective "because it did not form a part of the basis of the bargain between the parties to the sale." *Id. Bowdoin* was cited in *Hornberger v. General Motors Corp.*, 929 F.Supp.884 (E.D. Pa. 1996) as an example of jurisdictions that have held that "a disclaimer contained in materials which are provided to the purchaser subsequent to the sale cannot relieve the manufacturer of the implied warranty of merchantability." *Hornberger*, 929 F.Supp. at 889. The *Hornberger* court agreed with the reasoning in *Bowdoin* that "the buyer could not be

bound by the disclaimer to which he had never agreed at the time of the sale and which first appeared in an instruction manual that was included with the spray rig when it was delivered to the buyer, two weeks after the sale." *Id.*

In a final effort to argue the warranty disclaimer language is effective, defendant contends that the "sale" included delivery and installation and, therefore, the delivery of the Manual following the installation constituted notice, actual or constructive, at the time of the sale. This Court finds that, under the facts of this case, it is the time of the making of the contract for the purchase, not the time of the completion of defendant CTB's (or BMCI's) contractual obligations, that is the critical time for the notice of the disclaimer.

Based on the facts submitted on defendant's motion on plaintiff Flynn's breach of implied warranty claim, summary judgment is not proper. The Court will deny defendant's motion on that claim.

### 2. Fraud Claim

Plaintiffs Watkins and Underwood's fraud claim is based on allegations that CTB failed to disclose performance problems with the HT sweep to BMCI, that CTB could reasonably foresee that BMCI's customers would rely on the representations and omissions from CTB made to BMCI about the HT sweep, and that had BMCI been made aware of the HT sweep performance problems that information would have been passed on to plaintiffs and other customers. Further, plaintiffs allege that with this information, plaintiffs and those similarly situated would not have purchased the HT sweep. Plaintiffs argue that as a result of CTB's omissions of material facts (to BMCI), they "suffered

injury, including the purchase of bins and/or an unload system [HT sweep] that is not as valuable as they bargained for."

Defendant argues that plaintiffs cannot prove the facts necessary to establish the fraud claim because BMCI knew of performance problems with the HT sweep prior to the sales of the sweeps to plaintiffs, BMCI could not have relied on CTB's silence in the face of BMCI's own knowledge of the performance problems, and BMCI did not disclose the known performance problems to plaintiffs. This argument, however, raises fact issues that preclude summary judgment. How much BMCI knew about performance problems with the HT sweep and whether it would have advised its customers of other performance problems with the HT sweep if it had known are issues of disputed fact. That BMCI did not tell plaintiffs what it might have known about performance problems with the HT sweep is not dispositive of what it may have done with additional knowledge. BMCI's reliance on the information provided, or not provided, by CTB also involves disputed facts.

Next, defendant argues that plaintiffs cannot prove a fraud claim because CTB had no duty to disclose the alleged defects in its product to its dealers including BMCI. Plaintiffs allege that defendant fraudulently induced sales of the HT sweep by concealing material facts about the defective sweeps from BMCI and other dealers. Missouri does not recognize a separate tort of fraudulent nondisclosure. Instead, "a party's silence in the face of a legal duty to speak replaces the first element of a misrepresentation." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007). "In nondisclosure cases, a party's silence amounts to a misrepresentation where the law

imposes a duty to speak." *Id.* "Whether or not a duty to disclose exists . . . must be determined on the facts of the particular case." *Id.* "A duty to speak arises where one party has superior knowledge or information that is not reasonably available to the other." *Id.* "Silence can be an act of fraud where matters are not what they appear to be and the true state of affairs is not discoverable by ordinary diligence." *Id.*

"[A] jury is empowered to find that the buyer has a right to rely on the seller to disclose where the undisclosed material information would not be discoverable through ordinary diligence." *Id.* In a fraudulent nondisclosure case the analysis of proof of a duty to disclose and the right to rely collapses into a combined inquiry whether one party knew undisclosed material information that would not have been discovered through ordinary diligence. *Id.* at 765-66. This is normally a factual inquiry and, thus, a jury question. *Id.* at 766.

Missouri recognizes a cause of action for fraud that involves alleged fraudulent misrepresentations (and omissions) involving a third party. *Freeman v. Myers*, 774 S.W.2d 892 (Mo.App. W.D. 1989); *Pelster v. Ray*, 987 F.2d 514, 523 (8th Cir. 1993) ("[w]e also believe that the Missouri Supreme Court would allow a subsequent purchaser to state a fraudulent concealment claim against a wholesale auction even though the purchaser was not a party to the transaction in which the [fraudulent] concealment occurred"). In *Freeman*, the Missouri appellate court held that a former owner could be held liable to the purchaser of an automobile in a fraud action. 774 S.W.2d at 893-94. The former owner had rolled back the odometer on the automobile and then sold it to an auto sales business. *Id.* at 893. Plaintiff purchased the automobile, relying on the

mileage shown on the odometer and the odometer statement.  *Id.*  Plaintiff testified that she would not have purchased the automobile had she known the actual mileage.  *Id.*  The court held:

> The jury was entitled to infer . . . that the representation implicit in Myers' odometer rollback was intended or at least expected by him to extend to and be relied upon by a retail purchaser of the car from the automobile dealership to whom Myers sold the car.  The fact Myers' fraudulent statement was not made directly to the Freemans is not a defense to the Freemans' damage claim against him.  The rule is thus stated in Restatement (Second) of Torts § 533 (1977):
>
> > The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

*Id.* at 893-94 (citations omitted).

Like *Freeman*, a jury could find that defendant CTB could reasonably foresee that end purchasers, such as plaintiffs and other BMCI customers, would rely on the information CTB provided to BMCI about the HT sweep.  Martin testified that he relied on the information CTB provided as to the HT sweep.  Plaintiffs Watkins and Underwood testified that they relied upon BMCI as to the choice of the HT sweep.  Plaintiffs have submitted evidence that CTB had superior knowledge of the alleged defects in the HT sweep.  Thus, the question of duty is for the jury and is not proper for summary judgment.

Finally, defendant argues that plaintiffs' fraud claim is barred by the economic loss doctrine.  "Missouri's economic loss doctrine bars recovery under strict liability or negligence theories if the only damage is to the product sold."  *OneBeacon Ins. Co. v.*

*Deere & Co.*, 778 F.Supp.2d 1005 (8th Cir. 2011) (citing *Sharp Bros. Contracting Co. v. American Hoist & Derrick Co.*, 703 S.W.2d 901, 903 (Mo. banc 1986); *Clevenger & Wright Co. v. A.O. Smith Harvestore Prod. Inc.,* 625 S.W.2d 906, 909 (Mo. App. W.D. 1981)). "The remedy available in such cases is limited to contract or warranty claims." *Id.* "When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* (quoting *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871-72 (1986)). "The economic loss doctrine prohibits a plaintiff from seeking to recover in tort for economic losses that are contractual in nature." *Trademark Medical, LLC v. Birchwood Laboratories, Inc.*, 22 F.Supp.3d 998, 1002 (E.D. Mo. 2014).

Plaintiffs argue that their fraudulent inducement claim falls under the fraud exception to the economic loss doctrine. Although Missouri state courts have not addressed the application of the economic loss doctrine to fraud claims, this Court has addressed the issue. *Trademark Medical, LLC v. Birchwood Laboratories, Inc.*, 22 F.Supp.3d 998 (E.D. Mo. 2014); *Compass Bank v. Eager Road Associates, LLC*, 922 F.Supp.2d 818 (E.D. Mo. 2013); *Zoltek Corp. v. Structural Polymer Group, Ltd.*, 4:08CV460 CEJ, 2008 WL 4921611 (E.D. Mo. Nov. 13, 2008); *Self v. Equilon Enterprises, LLC*, 4:00CV1903 TIA, 2005 WL 3763533 (E.D. Mo. Mar. 30, 2005). The Eighth Circuit has also addressed the issue interpreting similar Minnesota law. *Marvin Lumber and Cedar Co. v. PPG Industries, Inc.*, 223 F.3d 873 (8th Cir. 2000). This Court declared, "[a] fraud claim *independent of the contract* is actionable, but it must be based upon a representation that was *outside of or collateral to the contract*, such as many

claims for fraudulent inducement." *Compass Bank*, 922 F.Supp.2d at 827 (emphasis in original). In *Compass*, the Court found that a fraudulent inducement claim was barred by the economic loss doctrine where the misrepresentations concerned matters within the contract and plaintiffs did not allege damages outside those recoverable for their breach of contract claim. *Id.* at 827-28.

The fraudulent inducement exception is subject to a widely recognized limitation that where the fraudulent misrepresentation concerns the quality, character, or safety of the goods sold, the economic loss doctrine bars the fraud claim because it is substantially redundant with warranty claims. *Trademark Medical*, 22 F.Supp.3d at 1003 (quoting *Marvin Lumber*, 223 F.3d at 885); *see also American Aerial Services, Inc. v. Terex USA, LLC*, 39 F.Supp.3d 95, 111 (D. Maine Aug. 15, 2014) (collecting cases). In *Dannix Painting, LLC v. Sherwin-Williams Co.*, 732 F.3d 902 (8th Cir. 2013), the Eighth Circuit stated:

> Where there are well-developed contractual remedies, such as the remedies that the [U.C.C.] (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation. The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law. Worse, the provision of these duplicative tort remedies would undermine contact law.

*Dannix*, 732 F.3d at 908. Although *Dannix* involved a negligence misrepresentation claim, this reasoning seems equally applicable to fraudulent misrepresentation and fraudulent inducement claims.

It is undisputed that plaintiffs' alleged losses are economic in nature. Plaintiffs' damages flow from their frustrated expectations about the quality and performance of the

HT sweep. In this regard, plaintiffs' remedy lies with contract and warranty law. Plaintiffs Watkins and Underwood had available the same breach of implied warranty claim as plaintiff Flynn but for the fact that their implied warranty claims are barred by the statute of limitations. The allegations that serve as the basis for the fraud claim in the second amended complaint arise out of the same facts that serve as the basis for the breach of implied warranty claim. Plaintiffs do not assert damages outside those that would be recoverable in a breach of implied warranty claim.

Besides their argument that the fraud exception to the economic loss doctrine allows their claim, plaintiffs contend their claim is supported by the holdings in *B.L. Jet Sales Inc. v. Alton Packaging Corp.*, 724 S.W.2d 669 (Mo.App. E.D. 1987) and *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818 (8th Cir. 1983). Plaintiffs argue that *B.L. Jet* stands for the proposition that absent a contract, the economic loss doctrine would not apply to a tort claim. In *B.L. Jet*, the plaintiff made a negligent misrepresentation claim regarding the provision of services and alleged the defendant failed to log and disclose repairs made to an airplane as required by federal regulations, industry practices, and the defendant's own practices. The facts and the legal issues in that case are distinguishable from this action.[3] Additionally, plaintiffs point out that in *Shatterproof*, the Eighth Circuit reversed a dismissal of a fraudulent inducement claim despite the presence of warranty remedies. In *Shatterproof*, the court did not address the

---

[3] This Court previously found that *B.L.Jet* was not applicable to a similar claim made by BMCI against defendant CTB with regard to the HT sweep. See *Bruce Martin Const., Inc. v. CTB, Inc.*, 1:10CV205 SNLJ, 2012 WL 718624, at *3-4 (E.D. Mo. Mar. 6, 2012) for that discussion.

economic loss doctrine in connection with the fraudulent inducement claim. Instead, the court found that the district court's dismissal of that claim on a Rule 12(b)(6) motion was based on a statute of limitations provision that was not applicable. The holdings in *B.L. Jet* and *Shatterproof* do not preclude the application of the law as discussed above. This Court finds that the economic loss doctrine bars plaintiffs' fraud claim and will grant summary judgment for defendant on the fraud claim.

## III. Motion for Class Certification

Plaintiffs seek class certification of a breach of implied warranty class with plaintiff Flynn as class representative and a fraud class with plaintiffs Watkins and Underwood as class representatives. Because this Court is granting the motion for summary judgment on the fraud claim on the basis that it is barred by the economic loss doctrine, the motion for class certification of the fraud class will be denied as moot.

For the warranty claim, plaintiff Flynn proposes the following class certification:

All end-purchasers in the United States who purchased and received delivery of the Harvest Time Bin Unloading System sweep augur between April 25, 2008 and April 25, 2012.

According to plaintiff, the HT sweep is not merchantable because it has design defects that prevent it from working as warranted and advertised to reliably sweep all free-flowing grains without the need for a worker to enter the bin and risk injury. The warranty class seeks damages permitted under the UCC and Indiana law, such as a refund, the cost of replacing the HT sweep with a competitor's merchantable product, or repair costs if so limited by the jury. The class period comports with the date of the

commencement of this action and the statute of limitations for breach of implied warranty claims under Indiana law.[4]

## A. Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with [Federal Rule of Civil Procedure] 23." *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013) (citations omitted). Rule 23(a) establishes four prerequisites for class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).

"The preliminary inquiry of the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013) (internal quotation marks and citation omitted). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 133 S.Ct. at 1432 (internal quotation marks and citation omitted). A plaintiff seeking to maintain a class action must satisfy the Rule 23(a)

---

[4] The statute of limitations for breach of implied warranty under Indiana law is four years. *Ind. Code Section 26-1-2-725*. It is the same under Missouri law. *Section 400.2-725 RSMo.*

prerequisites along with at least one provision of Rule 23(b).  *Comcast*, 133 S.Ct. at 1432.

In the instant case, the provision at issue for the warranty class is Rule 23(b)(3)

predominance, which requires a court to find that "the questions of law or fact common

to class members predominate over any questions affecting only individual members, and

that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."  Fed.R.Civ.P. 23(b).  "Rule 23(b)(3)'s predominance

criterion is even more demanding than Rule 23(a)."  *Comcast*, 133 S.Ct. at 1432.

## B.    Discussion

Plaintiff Flynn seeks class certification of a breach of implied warranty claim

based on the application of Indiana law to the entire class.  Defendant argues that Indiana

law does not apply; instead, the warranty laws of each state where a potential class

plaintiff received the HT sweep would apply.  In response, plaintiff maintains that the

parties agreed, and the Court found, that Indiana law applied to the breach of implied

warranty claim at the time of the motion to dismiss, and defendant is estopped from

arguing otherwise.

This Court's subject matter jurisdiction in this case arises from the Class Action

Fairness Act, 28 U.S.C. § 1332(d)(2).  "When deciding choice-of-law issues, the district

court sitting in a diversity action generally applies the choice-of-law rules of the forum

state."  *Global Petromarine v. G.T. Sales & Mfg., Inc.*, 577 F.3d 839, 844 (8th Cir. 2009).

"The Supreme Court has held an individualized choice-of-law analysis must be applied to

each plaintiff's claim in a class action."  *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1120

(8th Cir. 2005) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822-23 (1985)).

At the time of the motion to dismiss, the facts before the Court provided a basis for the determination that Indiana law applied. The Court, and the parties, relied on the allegations in the first amended complaint that the parties' agreement contained a choice-of-law provision. Specifically, paragraph 34 of the first amended complaint alleges:

> The back of all of the CTB invoices states that "Seller and its division have various warranties . . . the current warranty as to each product being sold to Buyer is specifically incorporated herein and made a part of 'Seller's Terms of Sale' by this reference." Paragraph 7 of the Terms of Sale states that the sales agreement shall be governed by the laws of the State of Indiana.

In the second amended complaint, however, plaintiffs allege that the named plaintiffs did not receive the invoices. Specifically, paragraph 33 of the second amended complaint alleges:

> The back of all of the CTB invoices, received only after the purchase of the equipment, states that "Seller and its division have various warranties … the current warranty as to each product being sold to Buyer is specifically incorporated herein and made a part of 'Seller's Terms of Sale' by this reference." Paragraph 7 of the Terms of Sale states that the sales agreement shall be governed by the laws of the State of Indiana. None of the CTB invoices have a signature block for the final purchaser to sign and acknowledge receipt of the invoice and any disclaimers of warranty on the invoice. None of the named Plaintiffs received the invoices nor the owners' manual that contained the warranty until after construction of the bins by Bruce Martin. Upon information and belief, Plaintiffs allege that other farmers who purchased CTB's power sweeps through a dealer (as is required), similarly did not receive an invoice or copy of warranty or disclosures until after their purchase.

Moreover, the facts presented on the motion for summary judgment and motion for class certification show that only BMCI received the invoices with the choice of law provision and the invoices were not provided to plaintiffs or other BMCI customers.

Plaintiff argues, in essence, that it is the law of the case that Indiana law applies because of the Court's earlier ruling on the motion to dismiss. Plaintiff further argues

that because CTB agreed Indiana law applied on the motion to dismiss, it is judicially

estopped from asserting a contrary position.  In support of this estoppel argument,

plaintiff cites *Global Petromarine v. G.T. Sales & Mfg., Inc.*, 577 F.3d 839 (8th Cir.

2009).  In *Global Petromarine*, Hewitt (defendant/third party plaintiff-Appellant)

appealed the district court's entry of summary judgment against it on its claim for

indemnification.  577 F.3d at 843-44.  On appeal, Hewitt argued that the district court

erred in applying Missouri law instead of the law of either North Carolina or South

Carolina.  *Id.*  Before the district court, however, Hewitt had argued that Missouri law

applied.  *Id.* at 845.  The Eighth Circuit stated "[i]t would be improper at this point to

allow Hewitt to alter its posture as to choice-of-law when it invited the district court to

apply Missouri law."  *Id.*  Further, the court pointed out that "[n]oticeably absent from

Hewitt's motion for summary judgment is any reference to the application of North

Carolina or South Carolina law as it pertains to the indemnification request."  *Id.*  Finally,

the court declared, "Hewitt asked the district court to apply Missouri law, and the district

court granted this request.  Accordingly, we will not reverse the district court decision as

to choice of law."  *Id.*

Global Petromarine* is factually and legally distinguishable from the instant

action.  There, Hewitt complained of error on appeal that it invited.  Hewitt's change in

position from what it argued before the district court and what it argued on appeal is not

comparable to the circumstances at issue.

"Judicial estoppel protects the integrity of the judicial process."  *Kraetsch v.*

*United Service Automobile Association*, 4:14CV264 CEJ, 2015 WL 1457015, at *1 (E.D.

Mo. Mar. 30, 2015) (internal quotation marks and citation omitted). "[A] party that takes a certain position in a legal proceeding, and succeeds in maintaining that position, is prohibited from thereafter assuming a contrary position simply because his interest have changed, especially if doing so prejudices the party who acquiesced in the position formerly taken by him." *Id.* (internal quotation marks and citation omitted). "Three factors, while not an exhaustive formula for determining the applicability of judicial estoppel, aid a court in determining whether to apply the doctrine." *Id.* (internal quotation marks and citation omitted). The three factors are:

> (1) the party's later position must be clearly inconsistent with its earlier position; (2) the party must have succeeded in persuading a court to accept [its] earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) the party must be in such a position that it would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at *2 (internal quotation marks and citation omitted.

Plaintiff's argument is similar to the one made by the plaintiffs in *Kraetsch*, which was rejected by the Court. In *Kraetsch*, plaintiffs filed an action for breach of an insurance policy and vexatious refusal to pay the insurance claim. The plaintiffs also sought class certification. Defendant removed the action to the district court based on plaintiffs' class allegations that met the requirements of 28 U.S.C. § 1332(d), i.e. more than 100 members and an amount in controversy exceeding $5 million. Thereafter, defendant moved to strike the class claims. Plaintiffs' interpreted defendant's notice of removal as a concession that a class was ascertainable, which they argued was contrary to the position taken in the motion to strike the class claims. Plaintiffs argued that

defendant was judicially estopped from taking a contrary position, precluding defendant from moving to strike the class claims.

The Court held judicial estoppel did not bar defendant's arguments in its motion to strike the class claims. The Court remarked "plaintiffs cite no authority for the proposition that judicial estoppel applies *within* a case, at different stages in litigation before a single court." *Id.* (emphasis in original). Further, the Court found that plaintiffs' argument "is wholly undercut by the Supreme Court's proclamation that absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity." *Id.* The Court noted that because the case was before it for the notice of removal and the motion to strike the class claims, there was no "prior proceeding," and further declared that the Court had not been misled. *Id.*

For the motion to dismiss in this action, this Court, and the parties, had to accept the allegations in the complaint as true. CTB derived no benefit from accepting the allegations in the complaint as true for purposes of the motion to dismiss. In fact, by law, it had no other choice. At this point in the case, this Court, and the parties, must look at the facts, supported by the evidence, that are relevant to the determination of the legal issues. This Court will not, and should not, determine the facts or law that applies based on the allegations in the first amended complaint (which is no longer the operative pleading) as opposed to the facts shown by the evidence. The evidence before the Court is that neither CTB nor BMCI provided the Terms of Sale to BMCI customers that purchased HT sweeps. This Court finds that CTB has not engaged in a change of

position as to the applicable law that is improper, unreasonable, prejudicial, or subject to estoppel. Further, based on the record before the Court at this time, this Court finds that Indiana law does not apply to plaintiff Flynn's breach of implied warranty claim.

Plaintiff offers no basis for a finding that Indiana law applies to plaintiff Flynn's claim, or any other potential plaintiff's claim, apart from its estoppel argument and the allegation in the complaint and subsequent amended complaints that Indiana warranty law applies. Instead, if the Court finds that Indiana law does not apply, plaintiff seeks certification of a Missouri warranty class, apparently conceding that a nation-wide class could not be certified.

Plaintiff suggests that the thirty-three BMCI purchasers of the HT sweep provided as support for certification of a Missouri fraud class would meet the requirements for certification of the warranty class. The Court has reviewed that list and found that only one of the thirty-three BMCI HT sweep purchasers falls within the period of the warranty class and that the one purchaser is plaintiff Flynn. The list provided to support the Missouri fraud class was based on a ten-year period. When the list is reduced to the four-year period of April 25, 2008 to April 25, 2012, only plaintiff Flynn remains.

In a final attempt to support class certification, plaintiff alleges the numerosity requirement can be met by sales from the dozen other CTB dealers that have sold Brock equipment in Missouri. With nothing more than a bare allegation, plaintiff fails to show that the proposed class can meet the numerosity requirement. Because class certification fails for that reason, it is unnecessary for the Court to address the remaining requirements

for class certification. The Court will deny the motion for class certification on the breach of implied warranty class.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment (ECF #84) is **GRANTED in part** and **DENIED in part**. The motion is uncontested on the breach of implied warranty claim of plaintiffs Watkins and Underwood, the fraud claim of plaintiff Flynn, and the breach of express warranty claim of all plaintiffs and, therefore, summary judgment is **granted** for defendant CTB on those claims. Additionally, summary judgment is **granted** for defendant CTB on the fraud claim of plaintiffs Watkins and Underwood. On the breach of implied warranty claim of plaintiff Flynn, summary judgment is **denied**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for class certification (ECF #82) is **DENIED.**

A separate Partial Judgment will accompany this Memorandum and Order.

Dated this 28th day of September, 2015.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE